UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| BETHANY REYNOLDS, | ) | CIV. 03-4250-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER GRANTING DEFENDANTS' |
| | ) | MOTION FOR SUMMARY |
| ETHICON ENDO-SURGERY, | ) | JUDGMENT |
| INC., and DAVE BURNS, | ) | |
| | ) | |
| Defendants. | ) | |

Plaintiff, Bethany Reynolds, sued defendants, Ethicon Endo-Surgery, Inc. (Ethicon), and Dave Burns, alleging violations of Title VII of the Civil Rights Act,[1] negligent infliction of emotional distress, and intentional infliction of emotional distress.  Defendants move for summary judgment on all of Reynolds' claims.  Defendants' motion for summary judgment is granted.

## BACKGROUND

Ethicon is a division of Johnson & Johnson Co.  It designs and distributes medical equipment, some of which is used in bariatric (weight loss) surgeries.  Ethicon employs full-line sales representatives, who deal with the full menu of Ethicon medical products.  In January of 2002, Ethicon created a

---

[1] Reynolds does not seek damages under Title VII individually from defendant Burns.  Reynolds' claims against Burns are limited to negligent infliction of emotional distress and intentional infliction of emotional distress.

new division focused on the growing bariatric market. Sales representatives in this division were called Bariatric Account Managers (BAMs).

In June of 1999, Ethicon hired Reynolds to work as a full-line sales representative in Fargo, North Dakota. During an eight-week training period, Ethicon decided to place her in Sioux Falls, South Dakota, instead. Working out of Sioux Falls, her sales territory covered North Dakota and South Dakota. In January of 2001, Reynolds was transferred to Ethicon's Pegasys Division, which distributed generators and generator accessories. She was still based in Sioux Falls, but her sales territory included Minnesota, South Dakota, and North Dakota.

In January 2002, Reynolds began to work as a BAM. Her sales territory included North Dakota, South Dakota, Minnesota, and parts of Wisconsin. Dave Burns, a Bariatrics Division Manager, was her immediate supervisor. Tom Anderson was Burns' supervisor. Reynolds alleges that Anderson discussed the possibility of Reynolds' relocating to Minneapolis because it was the biggest city in her sales territory. Reynolds alleges that Anderson recommended her over other applicants, including Steve Neuharth, an Ethicon full-line sales representative in Minneapolis. These discussions stopped when Anderson left the company and was replaced by Lee Putnam (who was later replaced by Beth Gulitis in July 2002).

In May 2002, Ethicon expanded its sales force from 22 to 36 BAMs. The new BAMs were trained in May and June of 2002, and began working in July

2002.  Ethicon created a new BAM position in Minneapolis to cover Minnesota and part of Wisconsin.  Minnesota and Wisconsin had been sliced off Reynolds' sales district.  Ethicon assigned Steve Neuharth to the Minneapolis BAM position.  Burns did not recommend Reynolds for the Minneapolis position.  Reynolds alleges that Burns was responsible for the decision to give the job to Neuharth, because Gulitis had to rely on his recommendations because she was new to her position.  After Minnesota and Wisconsin were removed, Iowa was added to Reynolds' sales territory.

With its market research projecting a growing demand for bariatric procedures, Ethicon determined that it needed to further expand its sales force.  On July 24, 2002, members of Ethicon's upper management held a meeting to discuss a plan to increase the number of BAMs from 36 to 54.  Gonzalo Sy-Quia, an Ethicon sales and market analytics manager, prepared a report weighing the comparative business conditions of 210 American markets.  It showed each market's total population, an estimate of each market's obese population, and whether the market had a BAM assigned to it.  Sioux Falls was ranked 120th, making it the lowest ranked market with a BAM based in it.  The second lowest rated market that had a BAM was Las Vegas, which ranked 52nd on the list.

Burns and Gulitis believed that it did not make sense to have a BAM based in the 120th best market for bariatric procedures, when they did not have BAMs based in markets with a much heavier demand for bariatric

3

surgery. Ethicon alleges that Burns and Randi Sandlin, a member of the human resources department, discussed eliminating the Sioux Falls territory at a July 31, 2002, meeting. By mid-August of 2002, Gulitis and Burns had decided to close the Sioux Falls territory and add a BAM to Louisville, Kentucky. Gulitis testified that Reynolds would be offered the choice to transfer to Louisville, or accept a severance package.

Reynolds does not dispute the substance of Gulitis's testimony, but points out that there is no definitive evidence as to when this was decided. Sandlin testified that she met with Burns on August 13, 2002, and discussed closing the Sioux Falls territory and offering the Louisville BAM position to Reynolds. Ethicon circulated a memo on September 23, 2002, announcing the expansion of the BAM sales team. It listed all the BAMs and the cities in which they were based. Reynolds was listed as the Sioux Falls BAM, and Louisville was not on the list. St. Louis was listed with the BAM to be determined.

Sandlin and Burns testified that on August 23, 2002, they again discussed closing the Sioux Falls territory and offering to transfer Reynolds to Louisville. In an email to Sandlin dated Monday, August 26, 2002, Burns stated:

> I appreciate our time together this past Friday and your input. As discussed, we will push forward with a territory collapse and either a separation [sic] or relo package offering for Bethany Reynolds. . . If having this by cob [close of business] on

4

> August 30th is appropriate we can look to step two of then delivering the message."

The email was a response to a message Sandlin sent to Burns on August 14, 2002. Sandlin's email described how the company had handled previous territory eliminations, along with relocation and severance packages. On August 29, 2002, Sandlin sent her supervisor an email with the subject "Elimination of Sioux Falls Territory." Sandlin asked him to review a letter she had prepared regarding a relocation or severance package.

On September 4, 2002, Reynolds found out she was pregnant. She told Burns she was pregnant that same day. Burns congratulated her and allegedly suggested that they keep that information to themselves. During the same call, he told her that he wanted to meet her in Sioux Falls on September 11, 2002. They had originally planned to meet on September 18, 2002, to discuss her performance evaluation.

During that meeting on September 11, 2002, instead of discussing her evaluation, Burns informed Reynolds that Ethicon was eliminating her sales territory. Ethicon contends that Burns told her that she could either transfer to Louisville or accept the severance package. Reynolds alleges that Burns only told her that she "probably" could take the Louisville job. It is undisputed that Burns gave her the letter detailing the relocation package and transfer to Louisville, or alternatively, a severance package. In the letter, Burns asked Reynolds to decide by September 18, 2002, and no later than

5

September 20, 2002.  If she chose to leave Ethicon rather than transfer, her last day of work would be October 28, 2002.

Reynolds told Burns and Sandlin that she was unwilling to decide whether or not to accept the transfer until after her baby was born.  Her due date was May 1, 2003.  Sometime between September 16 and September 18, Ethicon offered Reynolds the option of taking the St. Louis BAM position.  Reynolds alleges that this was a settlement offer suggested by Ethicon's attorneys hoping to avoid litigation, but she does not dispute that she was offered the St. Louis BAM position.  In late September of 2002, Reynolds suffered a miscarriage.  She contends that stress related to the elimination of her sales territory caused the miscarriage.  Reynolds was diagnosed with depression after the miscarriage and underwent counseling.

On October 22, 2002, Ethicon informed her that the option to transfer remained open.  Ethicon also moved her last day of employment to November 28, 2002.  Reynolds' employment was terminated when she refused to transfer.

After Reynolds left, Burns had no female employees on his sales team.  Reynolds' old territory was assigned to male sales representatives, and a male was hired to fill the Louisville position.

## LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment is not appropriate if a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id. The moving party bears the burden of bringing forward sufficient evidence to establish that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The nonmoving party is entitled to the benefit of all reasonable inferences to be drawn from the underlying facts in the record. Vette Co. v. Aetna Cas. & Sur. Co., 612 F.2d 1076, 1077 (8th Cir. 1980). The nonmoving party may not, however, merely rest upon allegations or denials in its pleadings, but must set forth specific facts by affidavits or otherwise showing that a genuine issue exists. Forrest v. Kraft Foods, Inc., 285 F.3d 688, 691 (8th Cir. 2002).

**DISCUSSION**

A.    **Title VIII**

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e-2(a)(1) (2004). In the absence of direct evidence of discrimination, the court analyzes the case using the familiar McDonnell Douglas standard. Peterson v. Scott County, 406 F.3d 515, 521 (8th Cir. 2005) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). The plaintiff has the initial burden of establishing a prima facie case of employment discrimination. Id. A prima facie case of employment discrimination raises a legal presumption of discrimination, requiring the defendant to show a nondiscriminatory reason for its actions. Id. The plaintiff then has the opportunity to demonstrate that the defendant's explanation was actually a pretext for unlawful discrimination. Id. Summary judgment should rarely be granted in employment discrimination cases because intent is frequently the main issue and claims are often based on inference. Id. at 520.

To establish a prima facie sex discrimination case involving the elimination or collapse of her position, Reynolds must show that she is a member of a protected class, she was qualified for her position, and she was

8

displaced.  See McLaughlin v. Esselte Pendaflex Corp., 50 F.3d 507, 510 (8th Cir. 1995).  She must also demonstrate that the "adverse employment decision occurred in circumstances which allow the court to infer unlawful discrimination." Id. (internal quotations omitted).  Ethicon does not dispute that Reynolds is a member of a protected class and was qualified to continue working as a BAM.  Ethicon contends, however, that it did not make an adverse employment decision regarding Reynolds because it offered to transfer her to the identical job with the same salary and same level of responsibility.

An adverse employment action is a "tangible change in working conditions that produces a material employment disadvantage." Jones v. Reliant Energy-ARKLA, 336 F.3d 689, 691 (8th Cir. 2003) (quoting Spears v. Missouri Dep't of Corrections & Human Resources, 210 F.3d 850, 853 (8th Cir. 2000).  Termination, reduction in pay, and changes that significantly affect an employee's career prospects are examples of adverse employment actions.  Id.  When a transfer is a demotion or is intended to be so unpleasant that the employee is forced to resign, it may be equivalent to a termination.  Rosado v. Santiago, 562 F.2d 114, 119 (1st Cir. 1977).  A transfer to an identical job in a different city, however, is not an adverse employment action.  Montandon v. Farmland Indus., Inc., 116 F.3d 355, 359 (8th Cir. 1997) (affirming summary judgment for defendant because transfer did not involve demotion, change in pay, or change in working conditions).

9

Reynolds relies on MacGregor v. Mallinckrodt, Inc., 373 F.3d 923, 928 (8th Cir. 2004), for her argument that whether or not there has been an adverse employment action is a question of fact for the jury. In MacGregor, there was a dispute over whether the plaintiff resigned or was terminated after refusing to accept a different position within the company. MacGregor, 373 F.3d at 928. The appeals court affirmed the verdict for the plaintiff because she had presented ample evidence of a discriminatory motive, and the position offered to her was "sufficiently inferior to constitute an adverse action." Id. at 929. Although her salary would have been the same, she would have lost her supervisory and budgetary responsibilities, "likely diminishing her career prospects." Id. Her suspicions that the new position was a "dead-end job" were confirmed when the company eliminated it a year after she had rejected it. Id.

Unlike the plaintiff in MacGregor, Reynolds does not dispute that she was offered a lateral transfer to a position with a job title, salary and advancement prospects identical to her Sioux Falls BAM position. The Louisville BAM position is still staffed by an Ethicon employee. Because it is undisputed that the transfer would not have changed her employment status, the elimination of her position coupled with the transfer offer does not rise to the level of an adverse employment action. See Montandon, 116 F.3d at 359. Unlike the MacGregor case, there is no jury question as to whether Reynolds

suffered an adverse employment action. Accordingly, Ethicon's motion for summary judgment is granted because Reynolds has failed to state a prima facie case of sex discrimination. See also Gartman v. Gencorp Inc., 120 F.3d 127, 130 (8th Cir. 1997) (reversing jury verdict for employee forced to choose between resigning and transferring to position with same job title, duties, pay and benefits because transfer offer was not an adverse action); Hoffman v. Rubin, 193 F.3d 959, 964 (8th Cir. 1999) (transfer of ATF agent to equivalent position in another city was not actionable, even though other agents in new office were hostile to plaintiff).

  Even if Reynolds had established a prima facie sex discrimination case, no reasonable jury could return a verdict in her favor. Ethicon has introduced uncontested evidence that it was planning on collapsing her territory and offering her the Louisville position before it learned she was pregnant. Reynolds does not dispute that Sioux Falls was by far the smallest market in which a BAM was located, based on Ethicon's definition of a "market" and its population of obese people. Although she argues that Ethicon's analysis was flawed because her sales territory covered an area much larger than Sioux Falls, a corporation may legally terminate or transfer an at will employee based on flawed data, or for any other reason except discrimination based on "race, color, religion, sex or national origin." See 42 U.S.C. § 2000e-2(a)(1). See also McLaughlin, 50 F.3d at 512 (recognizing that an employer may make

11

ridiculous or arbitrary personnel decisions, as long as they are applied in a nondiscriminatory manner).

While Reynolds disputes the exact date on which the decision was made to collapse her territory, she does not contest the validity of emails dated August 14, 2002, and August 26, 2002, in which Ethicon managers discuss collapsing her sales territory and offering her the choice of relocation or a severance package. According to the emails, Ethicon planned to complete its reorganization of Reynolds' position by August 30, 2002, which was before Reynolds notified her employer that she was pregnant. Accordingly, there is no genuine issue as to whether Ethicon's proffered reasons for terminating Reynolds were merely pretexts for sex discrimination. See Peterson, 406 F.3d at 521. Finally, Reynolds does not dispute that Ethicon offered her a transfer as late as October 22, 2002. Although Reynolds did not want to decide whether to accept the transfer until after the baby was born, by this time she was no longer pregnant. Accordingly, the court grants summary judgment in favor of Ethicon on the Title VII claim.

## B.     Intentional/Reckless Infliction of Emotional Distress

Reynolds contends that Ethicon is liable for intentional infliction of emotional distress (IIED) for eliminating her position while she was pregnant, and surprising her with the news at a meeting that had been planned for discussion of her performance evaluation. The elements of an IIED claim are:

> (1) An act by defendant amounting to <u>extreme</u> and <u>outrageous</u> conduct;
> (2) intent on the part of defendant to cause plaintiff <u>severe</u> emotional distress;
> (3) the defendant's conduct was the cause in-fact of plaintiff's injuries; and
> (4) the plaintiff suffered an extreme disabling emotional response to defendant's conduct.

<u>Petersen v. Sioux Valley Hosp. Ass'n</u>, 486 N.W.2d 516, 518 (S.D. 1992) (<u>Petersen I</u>) (emphasis in original). See also <u>Richardson v. East River Elec. Power Co-op.</u>, 531 N.W.2d 23, 27 (S.D. 1995); <u>Maryott v. First Nat'l Bank of Eden</u>, 624 N.W.2d 96, 104 (S.D. 2001). Under South Dakota law, "the tort of intentional infliction of emotional distress imposes liability on the defendant for intentional <u>and</u> reckless conduct resulting in emotional distress." <u>Petersen v. Sioux Valley Hosp. Ass'n</u>, 491 N.W.2d 467, 468 (S.D. 1992) (<u>Petersen II</u>) (emphasis in original). A defendant may be liable for IIED under a recklessness theory where his or her conduct constitutes a deliberate disregard of a high probability that the emotional distress will follow. <u>Id.</u>

Conduct that qualifies as IIED "must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community.'" <u>Harris v. Jefferson Partners, L.P.</u>, 653 N.W.2d 496, 500 (S.D. 2002) (quoting <u>Restatement (Second) of Torts</u> § 46 cmt. d (1965)). The question of whether the defendant's conduct was extreme and outrageous is initially for the trial court. <u>Id.</u> "When reasonable minds differ, it is for the jury to determine

13

whether the conduct has been sufficiently extreme and outrageous to result in liability." Kjerstad v. Ravellette Publ, Inc., 517 N.W.2d 419, 429 (S.D. 1994). One way to find extreme outrage is "the defendant's knowledge that the plaintiff is especially sensitive, susceptible, and vulnerable to injury through mental distress at the particular conduct." Id. (quoting The Law of Torts, Ch. 2, § 12, 62 (5th ed. 1984)).

Reynolds contends that material issues of disputed fact exist on this issue because she was surprised by the decision to eliminate her territory, and Ethicon was aware that she was pregnant and that moving would be difficult for her. The meeting had originally been planned to discuss her performance evaluation. The company was adding BAMs, so she did not think that a BAM position or territory would be eliminated. Furthermore, Reynolds was not allowed to apply for any of the other open BAM positions, except for St. Louis, which was offered to her a few weeks after she was notified of the elimination of her sales area.

The circumstances surrounding an employment termination can give rise to an IIED claim. See, e.g., Moysis v. DTG Datanet, 278 F.3d 819, 827 (8th Cir. 2002). In Moysis, the plaintiff suffered a brain injury in a work-related car accident. Id. at 822. During six months of rehabilitation, Moysis expressed a strong interest in returning to work. Id. His employer called him to suggest that he take a job with another company in Colorado, but Moysis

14

told him he wanted to return to Datanet, and asked when he could start. Id. at 823. His boss told him to come in the next day. Id. At the meeting the next day, his boss told him that he was firing him because customers and his co-workers had complained about his behavior (which was not true). Id. The court upheld the judgment for Moysis, in part because the defendant was aware that he had a medical condition that made him particularly vulnerable to emotional distress. Id. at 827 (citing Wangen v. Knudson, 428 N.W.2d 242, 248 (S.D. 1988), holding an employer liable for IIED where employer knew that plaintiff had been recently hospitalized for depression and terminated him under the pretense that the employee had failed to attend alcohol treatment).

     Failure to warn an employee about the nature of a meeting scheduled to discuss work-related problems may also raise a jury question as to whether the employer's conduct qualified as IIED. See Petersen I, 486 N.W.2d at 519. Petersen alleged that her employer failed to warn her about a meeting in which her co-workers confronted her about absenteeism and other work problems, despite her boss's knowledge that she feared confrontational group meetings. Id. at 519. Viewing the evidence in the light most favorable to the plaintiff, the court held that this could be considered reckless because her boss was aware of her fear of confrontational group meetings. Petersen I, 486 N.W.2d at 519. The court reversed summary judgment for the defendant, noting that where

reasonable minds could differ, the issue was for the jury to decide.  Id. (citing French v. Dell Rapids Comm. Hosp., Inc., 432 N.W.2d 285, 289 (S.D. 1988)).

Although Ethicon and Burns were aware that Reynolds was pregnant, she did not suffer from the severe medical problems that made the plaintiffs in Wangen and Moysis especially vulnerable to emotional distress.  Nor does Reynolds allege that Burns was hostile towards her when she was notified her territory was being eliminated.  See Richardson, 531 N.W.2d at 29. (affirming summary judgment for defendant employer where termination meeting was civilized but unpleasant for plaintiff).  Unlike the plaintiffs in the cases mentioned above, Reynolds was offered an identical position in Louisville and a relocation package.

On the other hand, Reynolds was taken by surprise by the decision to close her sales territory at a meeting that had been scheduled to evaluate her performance.  She had no reason to suspect her job was in jeopardy because the company was hiring new BAMs.  Reynolds contends that Burns' conduct could be considered reckless given his knowledge of her pregnancy and that she would be completely surprised by the decision.  Cf. Petersen I, 486 N.W.2d at 519.  Although Burns did not warn her that the evaluation meeting was actually a meeting to discuss the elimination of her position, this does not rise to the level of the outrageous behavior in Petersen I, where the defendant failed to warn the plaintiff that two of her co-workers would be confronting her

16

about her work problems, despite his awareness that she feared confrontational meetings. See id. While Reynolds' pregnancy made the news more difficult to hear, the court is unaware of any authority placing pregnancy in the category of medical conditions or illnesses that cause a particular vulnerability to severe emotional distress. See Moysis, 278 F.3d at 882 (plaintiff suffered from brain injury making him more vulnerable to emotional distress); Wangen, 428 N.W.2d at 248 (plaintiff had been recently hospitalized for severe depression). Viewing the evidence in the light most favorable to Reynolds, the court finds that the behavior of defendants does not amount to extreme and outrageous conduct that would permit a jury to return a verdict in her favor. See Petersen I, 486 N.W.2d at 518.

**C.    Negligent Infliction of Emotional Distress**

Reynolds brought a negligent infliction of emotional distress (NIED) claim alleging that Burns and Ethicon caused her miscarriage and subjected her to anxiety, shame, humiliation, and depression. The first element in this cause of action is that defendants engaged in negligent conduct. Blaha v. Stuard, 640 N.W.2d 85, 90 (S.D. 2002). The three elements of negligence are: (1) a duty on the part of the defendant; (2) a failure to perform that duty; and (3) an injury to the plaintiff resulting from such a failure. Id. A defendant may be liable for negligently causing foreseeable emotional distress accompanied by bodily harm. Wright v. Coca-Cola Bottling Co. of Cent. S.D.,

17

414 N.W.2d 608, 609-10 (S.D. 1987). Reynolds contends that the miscarriage she suffered qualifies as bodily harm for purposes of her NIED claim.

Reynolds contends that the same evidence that supports the claim for IIED supports this cause of action too. These are distinct causes of action, however, with different elements. Reynolds has not identified any case law that establishes a duty owed her. Thus, defendants are entitled to summary judgment on the NIED claim. See Richardson, 531 N.W.2d at 29 (affirming summary judgment for defendant where employee had no evidence to support NIED claim related to her termination). Accordingly it is hereby

ORDERED that defendants' motion for summary judgment (Docket 31) is granted.

IT IS FURTHER ORDERED that defendants' motion in limine to exclude the expert testimony of plaintiff's expert, Dr. Hansen, (Docket 29) is denied as moot.

Dated August 17, 2005.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE